**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DON RUPPEL, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br> v.<br><br>CONSUMERS UNION OF UNITED STATES, INC.,<br><br>       Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Don Ruppel ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## <u>INTRODUCTION</u>

1. Defendant Consumers Union of United States, Inc. ("Consumers Union")[1] sold personal information about Plaintiff Don Ruppel's *Consumer Reports* magazine subscription to list brokers, including for example NextMark, Inc., which in turn sold his information to telemarketers and other aggressive advertisers. As a result, Mr. Ruppel is being inundated with a barrage of unwanted junk mail and telephone solicitations. By selling Mr. Ruppel's Personal Reading Information (defined below), Consumers Union violated Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711, *et seq.* (the "PPPA").

---

[1] Consumers Union publishes *Consumer Reports*.

2.      Documented evidence confirms these facts.  NextMark's website offers to provide telemarketers access to the Personal Reading Information of 2,829,829 subscribers from the "CONSUMER REPORTS Mailing list" at a base price of "$110/M [per thousand]," (i.e., 11 cents apiece).

# CONSUMER REPORTS Mailing List

Published by Consumers Union, an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | | COUNTS THROUGH 02/29/2016 |
|---|---|---|
| 2,829,829 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 184,503 | 30 DAY HOTLINE SUBS | $125.00/M |
| 413,620 | 60 DAY HOTLINE SUBS | $120.00/M |
| 673,492 | 90 DAY HOTLINE SUBS | $120.00/M |
| 1,265,075 | 6 MONTH HOTLINE SUBS | $115.00/M |
| 2,829,829 | ACTIVE US SUBS | $110.00/M |
| 62,836 | 30 DAY EXPIRES | $75.00/M |
| 69,720 | ACTIVE CANADIAN SUBS | $150.00/M |
| | FUNDRAISER RATE US | $75.00/M |
| | FUNDRAISER RATE CANADA | $115.00/M |

| POPULARITY: | ===== 100 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA CANADA |
| GENDER: | 24% FEMALE 54% MALE |

**DESCRIPTION**

**ConsumerReports**®

Published by Consumers Union, an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements.  Use of the Consumer Reports list in no way endorses a mailer's products or services.  Since 1936, CU's mission has been to test products, inform the public and protect consumers.

Additional Charges:

Long Term Renewals        @ $15/M
New to File                @ $11/M

Preclearance is required for all first time uses.  Please allow up to 3 weeks for approval.

All orders cancelled after merge and/or mail date will be billed at full rental rate. Orders cancelled prior to merge will be billed a $100/F fee plus $10/M run charges and all applicable selection charges.  List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| CANADIAN | |
| CHANGE OF ADDRESS | $15.00/M |
| FOREIGN/INTERNATIONAL | |
| FORMER/EXPIRED SUBS | |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| LONG TERM RENEWALS | $15.00/M |
| NEW TO FILE | $11.00/M |
| PAID | $11.00/M |
| RENEWALS | $13.00/M |
| REUSE/CANADIAN MINIMUM FEE | $400.00/F |
| REUSE/U.S. MINIMUM FEE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

| RELATED LISTS |
|---|
| SMITHSONIAN MAGAZINE |
| CONSUMER REPORTS ON HEALTH |

*See* Complaint Ex. B.

3.      Consumers Union also offers access to an "Enhanced Mailing List," which includes Personal Reading Information of Consumer Reports subscribers based on, but not limited to, "age," "income," the "presence of children," "gender/sex," and whether the household is "Spanish speaking."

# CONSUMER REPORTS ENHANCED Mailing List

Published by Consumers Union, an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

Get Count     Get Pricing     Get More Information

| SEGMENTS | | COUNTS THROUGH 02/29/2016 | POPULARITY: ===== 98 | |
|---|---|---|---|---|
| 1,312,111 | TOTAL UNIVERSE / BASE RATE | $110.00/M | MARKET: | CONSUMER |
| 84,854 | 30 DAY HOTLINE SUBS | $125.00/M | CHANNELS: | 🖂 |
| 191,073 | 60 DAY HOTLINE SUBS | $120.00/M | SOURCE: | DIRECT MAIL |
| 308,705 | 90 DAY HOTLINE SUBS | $120.00/M | PRIVACY: | UNKNOWN |
| 582,775 | 6 MONTH HOTLINE SUBS | $115.00/M | DMA?: | YES - MEMBER |
| 1,312,111 | ACTIVE US SUBSCRIBERS | $110.00/M | STATUS: | PREFERRED PROVIDER |
| | FUNDRAISER RATE | $75.00/M | GEO: | USA |

DESCRIPTION

**ConsumerReports®**

Published by Consumers Union, an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

**Enhanced:**
Automotive
Cat
Computers
Cooking
Do-It-Yourself
Dog
Gardening Outdoors
Health
Investment/Finance
Pet
Presence of Children
Spanish Speaking

| | |
|---|---|
| GENDER: | 24% FEMALE 54% MALE |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| AGE | $15.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| ENHANCED | $15.00/M |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| INCOME | $10.00/M |
| PAID | $11.00/M |
| PRESENCE OF CHILD | |
| REUSE MINIMUM CHARGE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

| RELATED LISTS |
|---|
| CONSUMER REPORTS SHOPSMART |
| CONSUMER REPORTS |
| ALESCO NATIONAL CONSUMER DATABASE |

*See* Complaint Ex. C.

4.     Consumers Union also offers access to its "Age 50+ Subscribers Mailing List" at the same base rate of "$110.00/M."

# CONSUMER REPORTS AGE 50+ SUBSCRIBERS Mailing List

Published by Consumers Union. Consumer Reports is an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect customers.

**Get Count**   **Get Pricing**   **Get More Information**

| SEGMENTS | COUNTS THROUGH 02/29/2016 | POPULARITY: ▪▪▪▪▪ 96 | |
|---|---|---|---|
| 965,747 TOTAL UNIVERSE / BASE RATE | $110.00/M | MARKET: | CONSUMER |
| 62,949 30 DAY H/L SUBS | $125.00/M | CHANNELS: | |
| 141,798 60 DAY H/L SUBS | $120.00/M | SOURCE: | DIRECT MAIL |
| 429,921 90 DAY H/L SUBS | $120.00/M | PRIVACY: | UNKNOWN |
| 429,924 6 MONTH HOTLINE SUBS | $115.00/M | DMA?: | YES - MEMBER |
| 965,747 ACTIVE US SUBS | $110.00/M | STATUS: | PREFERRED PROVIDER |
| AGE (ALL ORDERS) | + $15.00/M | GEO: | USA |
| FUNDRAISER RATE - USA | $75.00/M | GENDER: | 24% FEMALE 55% MALE |

**DESCRIPTION**

**ConsumerReports**®

Published by Consumers Union.

Consumer Reports is an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements.  Use of the Consumer Reports list in no way endorses a mailer's products or services.  Since 1936, CU's mission has been to test products, inform the public and protect customers.

Additional Charges:

Long Term Renewals    @ $15/M
New to File           @ $11/M

All orders cancelled after merge and/or mail date will be billed at full rental rate.  Orders cancelled prior to merge will be billed a $100/F fee plus $10/M run charges and all applicable selection charges.  List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| AGE | $15.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| INCOME SELECT | $10.00/M |
| LONG TERM RENEWALS | $15.00/M |
| NEW TO FILE | $11.00/M |
| PAID | $11.00/M |
| RENEWALS | $13.00/M |
| REUSE MINIMUM CHARGE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

| RELATED LISTS |
|---|
| ⊟ MAYO CLINIC HEALTH LETTER |

*See* Complaint Ex. D.

5.      Michigan's PPPA clearly prohibits what Consumers Union has done.  Section 2 of the PPPA provides:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials ... shall not disclose to any person, other than the customer, a record or information concerning the purchase ... of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

6.      Accordingly, Plaintiff brings this Class Action Complaint against Consumers Union for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

7.      To supplement its sales and advertising revenues, Consumers Union sells its subscribers' personal information—including their full names, titles of magazines subscribed to, and home addresses (collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information such as gender, age, ethnicity, income, religion, parental status, and political affiliation—to data miners and other third parties without the written consent of its customers.

8.      Consumers Union's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, anyone can buy a customer list from Consumers Union that contains a number of categories of detailed subscriber information.  For example, a purchase could buy a list with the names and addresses of all Consumer Reports subscribers who are Spanish speaking, female, over the age of 80, with no children in the household, and with a net worth of greater than $500,000.  Consumers Union

would sell such a list for approximately $180 per thousand subscribers listed.

9.      While Consumers Union profits handsomely from the unauthorized sale and disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its subscribers' privacy and statutory rights because Consumers Union does not obtain its customers' written consent prior to selling their Personal Reading Information.

## PARTIES

10.      Plaintiff Don Ruppel is a natural person and citizen of the State of Michigan. Plaintiff Ruppel is a subscriber to *Consumer Reports* magazine, which is published by Consumers Union.  Prior to and at the time he subscribed to *Consumer Reports*, Consumers Union did not notify Plaintiff Ruppel that it discloses the Personal Reading Information of its customers, and Plaintiff Ruppel has never authorized Consumers Union to do so.  Furthermore, Plaintiff Ruppel was never provided any written notice that Consumers Union sells its customers' Personal Reading Information, or any means of opting out.  Since subscribing to *Consumer Reports*, Consumers Union disclosed, without consent or prior notice, Plaintiff Ruppel's Personal Reading Information to data mining companies including Insource and other, who then supplement that information with data from their own files.  Moreover, during that same period, Consumers Union sold mailing lists containing Plaintiff Ruppel's Personal Reading Information to third parties seeking to contact Consumers Union subscribers, without first obtaining Plaintiff Ruppel's written consent or even giving him prior notice of the disclosure and sales.  Because Consumers Union sold and disclosed his Personal Reading Information, Plaintiff Ruppel now receives junk mail and telephone solicitations offering discounted magazine subscriptions, among other things.  These unwarranted offers waste Plaintiff Ruppel's time, money, and resources.  These harassing junk mail offerings and phone call solicitations received

6

by Plaintiff Ruppel are attributable to Consumers Union's unauthorized sale and disclosure of his Personal Reading Information. Because Plaintiff Ruppel is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Consumers Union's sale of his Personal Reading Information deprived Plaintiff Ruppel of the full set of benefits to which he was entitled as a part of his *Consumer Reports* subscription, thereby causing economic harm. Accordingly, what Plaintiff Ruppel received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Consumer Reports* subscription had he known that Consumers Union would disclose his Personal Reading Information.

11.     Defendant Consumers Union of United States, Inc. is a New York not-for-profit corporation with its principal place of business at 101 Truman Avenue, Yonkers, NY 10703. Consumers Union does business throughout Michigan, New York, and the entire United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Consumers Union because Consumers Union conducts substantial business within New York, such that Consumers Union has significant, continuous, and pervasive contacts with the State of New York. Additionally, Consumers Union is a New York not-for-profit corporation, with its principal place of business

in Yonkers, New York.

14.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Consumers Union does substantial business in this District, a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District, and Consumers Union's principal place of business is in this District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

15.      In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

16.      Recognizing the need to further protect its citizens' privacy rights, Michigan's legislature enacted the PPPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378 (West).

17.      Section 2 of the PPPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

18.      Michigan's protection of reading information reflects the "gut feeling that

8

people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

19.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

20.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

21.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else for that matter."  *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit A**).

22.     Despite the fact that thousands of Michigan residents subscribe to Consumers Union publications, Consumers Union disregarded its legal responsibility by systematically violating the PPPA.

### *The Personal Information Market: Consumers' Personal Information Has Real Value*

23.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

24.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

25.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[4]

26.     In fact, an entire industry exists while companies known as data miners purchase, trade, and collect massive databases of information about consumers.  Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely

---

[2] The Information Marketplace:  Merging and Exchanging Consumer Data  (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf  (last visited July 15, 2015).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited July 15, 2015).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at 2,  *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf  (last visited July 15, 2015) (emphasis added).

unregulated market.[5]

27.     The scope of data miners' knowledge about consumers is immense:  "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[6]

28.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

29.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

30.     In their letter, the co-Chairmen recognized that:

By combining data from numerous offline and online sources, data

---

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited July 15, 2013).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited May 12, 2015).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited July 15, 2015).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited July 15, 2015).

brokers have developed hidden dossiers on every U.S. consumer.
This large[-]scale aggregation of the personal information of
hundreds of millions of American citizens raises a number of
serious privacy concerns.[9]

31.     Data mining is especially troublesome when consumer information is sold to

direct-mail advertisers.  In addition to causing waste and inconvenience, direct-mail advertisers

often use consumer information to lure unsuspecting consumers into various scams,[10] including

fraudulent sweepstakes, charities, and buying clubs.  Thus, when companies like Consumers

Union share information with data miners and direct-mail advertisers, they contribute to the

"[v]ast databases of names and personal information" that are often "sold to thieves by large

publicly traded companies," which "put[s] almost anyone within the reach of fraudulent

telemarketers" and other criminals.[11]

32.     Information disclosures like Consumers Union's are particularly dangerous to

the elderly.  "Older Americans are perfect telemarketing customers, analysts say, because they

are often at home, rely on delivery services, and are lonely for the companionship that telephone

callers provide."[12]  The FTC notes that "[t]he elderly often are the deliberate targets of

fraudulent telemarketers who take advantage of the fact that many older people have cash

---

[9] *Id.*

[10] *See Prize Scams*, Federal Trade Commission, http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited July 15, 2015).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007, *available at* http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0 (last visited July15, 2015).

[12] *Id.*

reserves or other assets to spend on seemingly attractive offers."[13]

33. Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Consumers Union's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

34. Consumers Union is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

35. Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

### Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases

36. As the data mining industry has grown, so too have consumer concerns regarding the privacy of their personal information.

37. A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they

---

[13] *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited July 15, 2015).

[14] *See id.*

believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled

said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

38.     Thus, as consumer privacy concerns grow, consumers are increasingly

incorporating privacy concerns and values into their purchasing decisions and companies viewed

as having weaker privacy protections are forced to offer greater value elsewhere (through better

quality and/or lower prices) than their privacy- protective competitors.

39.     In fact, consumers' personal information has become such a valuable

commodity that companies are beginning to offer individuals the opportunity to sell their

personal information themselves.[17]

40.     These companies' business models capitalize on a fundamental tenet underlying

the personal information marketplace:  consumers recognize the economic value of their private

data.  Research shows that consumers are willing to pay a premium to purchase services from

companies that adhere to more stringent policies of protecting their personal data.[18]

41.     Thus, in today's economy, individuals and businesses alike place a real,

---

[15] *See 2013 TRUSTe US Consumer Confidence Index*, TRUSTe, http://www.truste.com/us-consumer-confidence-index-2013/ (last visited July 15, 2015).

[16] *Id.*

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited July 15, 2015).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited July 15, 2015).

quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

### Consumers Union Unlawfully Sells its Subscribers' Personal Reading Information

42.    Consumers Union maintains a vast digital database comprised of its subscribers' Personal Reading Information.  Consumers Union discloses its subscribers' Personal Reading Information to data mining companies including Insource and other, who then supplement that information with additional sensitive personal information about each Consumers Union subscriber, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children.  (*See, e.g.*, **Exhibits B-D**).

43.    Consumers Union then sells its mailing lists—which include subscribers' Personal Reading Information identifying which individuals purchased which magazines, and can include the sensitive information obtained from data miners—to data miners, other consumer-facing businesses, non-profit organizations seeking to raise awareness and solicit donations, and to political organizations soliciting donations, votes, and volunteer efforts. (*See* **Exhibits B–D**).

44.    As a result of Consumers Union's data compiling and sharing practices, companies can purchase mailing lists from Consumers Union that identify *Consumer Reports*

---

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited July 15, 2015) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

subscribers by their most intimate details:  income, political affiliation, religious practice, and charitable donations.  Consumers Union's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers.  For example, Consumers Union will sell—to anyone willing to pay for it—a list with the names and addresses of all *Consumer Reports* subscribers who are Jewish, Republican, single, over the age of 80, with a net worth of greater than $500,000, no children in the household, and a history of charitable donations.

45.      Consumers Union does not seek its subscribers' prior written consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

46.      Consumers can sign up for *Consumer Reports* subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Consumers Union never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Consumers Union uniformly fails to obtain any form of consent from – or even provide effective notice to – its subscribers before disclosing their Personal Reading Information.

47.      As a result, Consumers Union disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

48.      By and through these actions, Consumers Union has intentionally disclosed to

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited July 15, 2015).

third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the PPPA with Plaintiff and other members of the Class.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff seeks to represent a class defined as all Michigan residents who had their Personal Reading Information disclosed to third parties by Consumers Union without consent (the "Class").  Excluded from the Class is any entity in which Defendant has a controlling interest, and officers or directors of Defendant.

50.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

51.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Consumers Union is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines); (b) whether Consumers Union obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Consumers Union's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Preservation of Personal Privacy Act, M.C.L. § 445.1712; and (d) whether Consumers Union's sale of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

52.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful

17

conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading

Information.

53.     Plaintiff is an adequate representative of the Class because his interests do not

conflict with the interests of the Class members he seeks to represent, he has retained competent

counsel experienced in prosecuting class actions, and he intends to prosecute this action

vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff

and his counsel.

54.     The class mechanism is superior to other available means for the fair and efficient

adjudication of the claims of Class members.  Each individual Class member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and

extensive litigation necessary to establish Defendant's liability.  Individualized litigation

increases the delay and expense to all parties and multiplies the burden on the judicial system

presented by the complex legal and factual issues of this case.  Individualized litigation also

presents a potential for inconsistent or contradictory judgments.  In contrast, the class action

device presents far fewer management difficulties and provides the benefits of single

adjudication, economy of scale, and comprehensive supervision by a single court on the issue of

Defendant's liability.  Class treatment of the liability issues will ensure that all claims and

claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
### Violation of the Preservation of Personal Privacy Act
### (M.C.L. § 445.1712)

55.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully

set forth herein.

56.     Plaintiff brings this claim individually and on behalf of members of the Class

against Defendant Consumers Union.

57.     As a magazine publisher that sells subscriptions to consumers, Consumers Union is engaged in the business of selling written materials at retail.  *See* M.C.L. § 445.1712.

58.     By subscribing to *Consumer Reports*, Plaintiff purchased written materials directly from Consumers Union.  *See* M.C.L. § 445.1712.

59.     Because Plaintiff purchased written materials directly from Consumers Union, he is a "customer" within the meaning of the PPPA.  *See* M.C.L. § 445.1711(a).

60.     At all times relevant, and beginning on the dates Plaintiff initiated his *Consumer Reports* subscription, Consumers Union disclosed Plaintiff's Personal Reading Information, which identified him as a *Consumer Reports* subscriber, in at least two ways.

61.     First, Consumers Union disclosed mailing lists containing Plaintiff's Personal Reading Information to data mining companies including Insource, and other, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Consumers Union.

62.     Second, Consumers Union sold its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data miners—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes.

63.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Consumers Union was able to increase its profits gained from the mailing list sales.

64.     By selling or otherwise disclosing its subscriber lists, Consumers Union disclosed to persons other than Plaintiff records or information concerning his purchase of written

materials from Consumers Union.  *See* M.C.L. § 445.1712.

65.     The information Consumers Union disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed to *Consumer Reports*.  Accordingly, the records or information disclosed by Consumers Union indicate Plaintiff's identity.  *See* M.C.L. § 445.1712.

66.     Plaintiff and the members of the Class never consented to Consumers Union disclosing their Personal Reading Information to anyone.

67.     Worse yet, Plaintiff and the members of the Class did not receive notice before Consumers Union disclosed their Personal Reading Information to third parties.

68.     On information and belief, Consumers Union's disclosures of Plaintiff's and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

69.     Consumers Union's disclosures of Plaintiff's and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

70.     Consumers Union's disclosures of Plaintiff's Personal Reading Information were made to data miners, direct-mail advertisers, and organizations soliciting monetary contributions, volunteer work, and votes—all in order to increase Consumers Union's revenue.  Accordingly, Consumers Union's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

71.     By disclosing Plaintiff's Personal Reading Information, Consumers Union violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits. *See* M.C.L. § 445.1712.

72.     Additionally, because Plaintiff and the members of the Class paid for their Consumers Union subscriptions, and Consumers Union was obligated to comply with the PPPA,

Consumers Union's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions.  Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Consumers Union's unlawful sale and disclosure of their Personal Reading Information caused him to receive less value than he paid for, thereby causing him economic harm.

73.     Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is more valuable than one that does not.

74.     Accordingly, had Plaintiff been adequately informed of Consumers Union's disclosure practices, he would not have been willing to purchase his *Consumer Reports* subscription at the price charged, if at all.  Thus, Consumers Union's unlawful disclosures caused Plaintiff economic harm.

75.     Consumers Union's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third party print advertisements and marketing calls to his cellular phone.

76.     As a result of Consumers Union's unlawful disclosure of their Personal Reading Information, Plaintiff and the members of the Class have suffered privacy and economic injuries. On behalf of himself and the Class, Plaintiff seeks:  (1) an injunction requiring Defendant Consumers Union to obtain consent from Michigan subscribers prior to the disclosure of their Personal Reading Information as required by the PPPA; (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## COUNT II
### Unjust Enrichment

77.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

78.     Plaintiff brings this claim individually and on behalf of the members of the Class against Defendant.

79.     Plaintiff and the Class members conferred benefits on Consumers Union by providing Consumers Union with their Personal Reading Information and paying Consumers Union for their magazine subscriptions.  Consumers Union received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Consumers Union publications.

80.     Because Consumers Union received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Consumers Union has employees handling customer accounts and billing as well as customer data, Consumers Union appreciates or has knowledge of such benefits.

81.     Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

82.     Under principles of equity and good conscience, because Consumers Union failed to comply with the PPPA, Consumers Union should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by selling Plaintiff's and the Class's Personal Reading Information.

83.     Plaintiff and the other Class members have suffered actual damages as a result of Consumers Union's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This

22

amount is tangible and will be calculated at trial.

84.     Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Consumers Union's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine subscriptions when they otherwise would not have.

85.     Further, a portion of the purchase price of each Consumers Union magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

86.     To prevent inequity, Consumers Union should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading Information and all money derived from Consumers Union's sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

87.     Accordingly, Plaintiff and the Class members seek an order declaring that Consumers Union's conduct constitutes unjust enrichment, and awarding Plaintiff and the Class restitution in an amount to be calculated at trial equal to the amount of  money obtained by Consumers Union through its sale and disclosure of Plaintiff's and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

88.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks a judgment against Defendant as follows:

A.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Plaintiff's attorneys as Class Counsel to represent the Class.

B.  For an order declaring that Defendant's conduct as described herein violates the Preservation of Personal Privacy Act, M.C.L. § 445.1712;

C.  For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

D.  For an award of actual damages, including disgorgement and restitution, or $5,000, whichever is greater, to Plaintiff and each Class member, as provided by the Preservation of Personal Privacy Act, M.C.L. § 445.1715(a);

E.  For prejudgment interest on all amounts awarded;

F.  For an order of restitution and all other forms of equitable monetary relief;

G.  For injunctive relief as pleaded or as the Court may deem proper; and;

H.  For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated:  April 1, 2016                       Respectfully submitted,

                                            **BURSOR & FISHER, P.A.**


                                            By:   _/s/ Joseph I. Marchese_
                                                   Joseph I. Marchese

                                            Scott A. Bursor
                                            Joseph I. Marchese
                                            Frederick J. Klorczyk III
                                            Philip L. Fraietta
                                            888 Seventh Avenue
                                            New York, NY  10019
                                            Telephone: (646) 837-7150
                                            Facsimile:  (212) 989-9163
                                            Email:  scott@bursor.com
                                                    jmarchese@bursor.com
                                                    fklorczyk@bursor.com
                                                    pfraietta@bursor.com

                                            *Attorneys for Plaintiff*

**EXHIBIT A**



**House
Legislative
Analysis
Section**

Washington Square Building, Suite 1025
Lansing, Michigan 48909
Phone: 517/373-6466

# PRIVACY: SALES, RENTALS OF VIDEOS, ETC.

**House Bill 5331** as enrolled
Second Analysis (1-20-89)

**Sponsor: Rep. David Honigman
House Committee: Judiciary
Senate Committee: Judiciary**

## THE APPARENT PROBLEM:

During the period when Congressional confirmation hearings were being held on the nomination of Robert Bork to the Supreme Court, a Washington weekly obtained and published a list of videotapes rented under Bork's wife's account. Many found this to be an unwarranted invasion of privacy, and the incident prompted the introduction in Congress of a bill to protect the privacy of those who rent or buy videotapes. Many in Michigan also believe that one's choice in videos, records, and books is nobody's business but one's own, and suggest the enactment of a statute to explicitly protect a consumer's privacy in buying and borrowing such items.

## THE CONTENT OF THE BILL:

The bill would create a new public act to preserve personal privacy with respect to the purchase, rental, or borrowing of written materials, sound recordings, and video recordings. Except as otherwise provided by law, a retailer, lender, or renter of such items could not disclose information — such as selections made — on a particular customer to any person other than that customer. Such information could be disclosed with the customer's written permission, under a court order, to the extent reasonably necessary to collect past-due payment, for the exclusive purpose of marketing goods and services directly to the consumer, or under a search warrant. Violation of the bill would be a misdemeanor.

## FISCAL IMPLICATIONS:

The House Fiscal Agency says that the bill would have no fiscal implications. (1-18-89)

## ARGUMENTS:

### For:

The bill would recognize that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers, clubs, or anyone else, for that matter. The bill would complement the Library Privacy Act, which exempts library records on a person from disclosure under the Freedom of Information Act and prohibits disclosure absent a court order or the individual's consent.

**Response:** The bill, while laudable in its aims, may be unnecessary for libraries, which already are subject to civil penalties for violating the Library Privacy Act.

### Against:

The bill could offer more in the way of recourse for injured parties if it provided for civil damages as well as criminal misdemeanor penalties. Civil remedies not only offer a person recompense for harm done: they free a person from having to rely on a prosecutor's office to pursue a case.

H.B. 5331 (1-20-89)

**EXHIBIT B**



15% Off Your First List!
Start running a real-time count on the right.

CHANNEL:
POSTAL
EMAIL
PHONE

GEOGRAPHY:

Call Exact Data!
877.488.1373

GET REAL-TIME QUOTE

# CONSUMER REPORTS Mailing List

Published by Consumers Union, an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

877-972-4876
Mention NextMark
FOR 10% OFF

Niche Audiences

Postal, Email, and Phone Lists

A+ BBB Accredited

CLICK HERE
FOR COUNTS AND PRICING
ON ANY LIST

**Get Count**   **Get Pricing**   **Get More Information**

## SEGMENTS

| | | |
|---|---|---|
| 2,829,829 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 184,503 | 30 DAY HOTLINE SUBS | $125.00/M |
| 413,620 | 60 DAY HOTLINE SUBS | $120.00/M |
| 673,492 | 90 DAY HOTLINE SUBS | $120.00/M |
| 1,265,075 | 6 MONTH HOTLINE SUBS | $115.00/M |
| 2,829,829 | ACTIVE US SUBS | $110.00/M |
| 62,836 | 30 DAY EXPIRES | $75.00/M |
| 69,720 | ACTIVE CANADIAN SUBS | $150.00/M |
| | FUNDRAISER RATE US | $75.00/M |
| | FUNDRAISER RATE CANADA | $115.00/M |

*COUNTS THROUGH 02/29/2016*

| | |
|---|---|
| POPULARITY: | ▪▪▪▪▪ 100 |
| MARKET: | CONSUMER |
| CHANNELS: | |
| SOURCE: | DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA<br>CANADA |
| GENDER: | 24% FEMALE 54% MALE |

## DESCRIPTION

**ConsumerReports**

Published by Consumers Union, an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

Additional Charges:

| | |
|---|---|
| Long Term Renewals | @ $15/M |
| New to File | @ $11/M |

Preclearance is required for all first time uses. Please allow up to 3 weeks for approval.

All orders cancelled after merge and/or mail date will be billed at full rental rate. Orders cancelled prior to merge will be billed a $100/F fee plus $10/M run charges and all applicable selection charges. List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

## ORDERING INSTRUCTIONS

- To order this list, contact your List Broker and ask for NextMark List ID #81301 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- NET NAME IS ALLOWED($10.00/M RUN CHARGE)

### SELECTS

| | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| CANADIAN | |
| CHANGE OF ADDRESS | $15.00/M |
| FOREIGN/INTERNATIONAL | |
| FORMER/EXPIRED SUBS | |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| LONG TERM RENEWALS | $15.00/M |
| NEW TO FILE | $11.00/M |
| PAID | $11.00/M |
| RENEWALS | $13.00/M |
| REUSE/CANADIAN MINIMUM FEE | $400.00/F |
| REUSE/U.S. MINIMUM FEE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

### ADDRESSING

| | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

### RELATED LISTS

- SMITHSONIAN MAGAZINE
- CONSUMER REPORTS ON HEALTH
- I-BEHAVIOR DATABASE
- TOTALSOURCE PLUS - MASTERFILE
- EASTER SEALS DIRECT MAIL DONOR MASTERFILE
- HARRIET CARTER CATALOG BUYERS
- MAYO CLINIC HEALTH LETTER
- SPECIAL OLYMPICS INTERNATIONAL
- AMERICAN LUNG ASSOCIATION DONOR MASTERFILE

- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

HABITAT FOR HUMANITY, INT'L

**Get Count**  **Get Pricing**  **Get More Information**

**EXHIBIT C**



**15% Off Your First List!**
Start running a real-time count on the right.

CHANNEL:
POSTAL
EMAIL
PHONE

GEOGRAPHY:

Call Exact Data!
**877.488.1373**

GET REAL-TIME QUOTE

# CONSUMER REPORTS ENHANCED Mailing List

Published by Consumers Union, an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.



**877-972-4876**
Mention NextMark
**FOR 10% OFF**

Niche Audiences

Postal, Email, and Phone Lists

A+ BBB Accredited

**CLICK HERE**
FOR COUNTS AND PRICING
ON ANY LIST

Get Count   Get Pricing   Get More Information

| SEGMENTS | | |
|---|---|---|
| | *COUNTS THROUGH 02/29/2016* | |
| 1,312,111 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 84,854 | 30 DAY HOTLINE SUBS | $125.00/M |
| 191,073 | 60 DAY HOTLINE SUBS | $120.00/M |
| 308,705 | 90 DAY HOTLINE SUBS | $120.00/M |
| 582,775 | 6 MONTH HOTLINE SUBS | $115.00/M |
| 1,312,111 | ACTIVE US SUBSCRIBERS | $110.00/M |
| | FUNDRAISER RATE | $75.00/M |

| | |
|---|---|
| POPULARITY: | ▮▮▮▮▮ 98 |
| MARKET: | CONSUMER |
| CHANNELS: | ✉ |
| SOURCE: | DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 24% FEMALE 54% MALE |

## DESCRIPTION



Published by Consumers Union, an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect consumers.

**Enhanced:**
Automotive
Cat
Computers
Cooking
Do-It-Yourself
Dog
Gardening Outdoors
Health
Investment/Finance
Pet
Presence of Children
Spanish Speaking

Preclearance is required for all first time uses. Please allow up to 3 weeks for approval.

All orders cancelled after merge and/or mail date will be billed at full

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| AGE | $15.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| ENHANCED | $15.00/M |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| INCOME | $10.00/M |
| PAID | $11.00/M |
| PRESENCE OF CHILD | |
| REUSE MINIMUM CHARGE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

| RELATED LISTS |
|---|
|  CONSUMER REPORTS SHOPSMART |
| CONSUMER REPORTS |
| ALESCO NATIONAL CONSUMER DATABASE |
| MAYO CLINIC HEALTH LETTER |
| HANNA ANDERSSON |
| EDDIE BAUER - CATALOG BUYERS HIGHLIGHTS FOR CHILDREN |
| CONTINUITY BOOK CLUBS FOR KIDS MASTERFILE |
| CURRENT GENERAL MERCHANDISE CATALOG |

rental rate. Orders cancelled prior to merge will be billed a $100/F fee plus $10/M run charges and all applicable selection charges.  List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

HARVARD HEALTH PUBLICATIONS MASTERFILE

PLOW & HEARTH

**ORDERING INSTRUCTIONS**

- To order this list, contact your List Broker and ask for NextMark List ID #271856 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT
- NET NAME IS ALLOWED($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

**Get Count**    **Get Pricing**    **Get More Information**

**EXHIBIT D**



# CONSUMER REPORTS AGE 50+ SUBSCRIBERS Mailing List

Published by Consumers Union. Consumer Reports is an independent, nonprofit testing and information organization. Consumer Reports contains no outside advertising and does not sell endorsements. Use of the Consumer Reports list in no way endorses a mailer's products or services. Since 1936, CU's mission has been to test products, inform the public and protect customers.

**Get Count**    **Get Pricing**    **Get More Information**

| SEGMENTS | *COUNTS THROUGH 02/29/2016* | |
|---|---|---|
| 965,747 | TOTAL UNIVERSE / BASE RATE | $110.00/M |
| 62,949 | 30 DAY H/L SUBS | $125.00/M |
| 141,798 | 60 DAY H/L SUBS | $120.00/M |
| 429,921 | 90 DAY H/L SUBS | $120.00/M |
| 429,924 | 6 MONTH HOTLINE SUBS | $115.00/M |
| 965,747 | ACTIVE US SUBS | $110.00/M |
| | AGE (ALL ORDERS) | + $15.00/M |
| | FUNDRAISER RATE - USA | $75.00/M |

**DESCRIPTION**

**ConsumerReports**®

Published by Consumers Union.

Consumer Reports is an independent, nonprofit testing and information organization.

Consumer Reports contains no outside advertising and does not sell endorsements.  Use of the Consumer Reports list in no way endorses a mailer's products or services.  Since 1936, CU's mission has been to test products, inform the public and protect customers.

Additional Charges:

Long Term Renewals    @ $15/M
New to File    @ $11/M

All orders cancelled after merge and/or mail date will be billed at full rental rate.  Orders cancelled prior to merge will be billed a $100/F fee plus $10/M run charges and all applicable selection charges.  List owner/manager needs to be notified of any cut backs or cancellations before the merge happens.

**ORDERING INSTRUCTIONS**
- To order this list, contact your List Broker and ask for NextMark List ID #208494 or click here to place your request.
- Use NextMark List Order Entry Software or Bionic Media Planning Software
- 5,000 NAME MINIMUM ORDER $0.00 MINIMUM PAYMENT

| POPULARITY: | ▪▪▪▪▪ 96 |
|---|---|
| MARKET: | CONSUMER |
| CHANNELS: | 📬 |
| SOURCE: | DIRECT MAIL |
| PRIVACY: | UNKNOWN |
| DMA?: | YES - MEMBER |
| STATUS: | PREFERRED PROVIDER |
| GEO: | USA |
| GENDER: | 24% FEMALE 55% MALE |

| SELECTS | |
|---|---|
| 1 MONTH HOTLINE | |
| 3 MONTH HOTLINE | |
| ACTIVE SUBSCRIBERS | |
| AGE | $15.00/M |
| CHANGE OF ADDRESS | $15.00/M |
| GENDER/SEX | $8.00/M |
| HOTLINE | |
| INCOME SELECT | $10.00/M |
| LONG TERM RENEWALS | $15.00/M |
| NEW TO FILE | $11.00/M |
| PAID | $11.00/M |
| RENEWALS | $13.00/M |
| REUSE MINIMUM CHARGE | $200.00/F |
| SCF | $8.00/M |
| SOURCE | $11.00/M |
| STATE | $8.00/M |
| ZIP | $8.00/M |

| ADDRESSING | |
|---|---|
| KEY CODING | NOT AVAILABLE |
| CARTRIDGE (FLAT FEE) | $25.00/F |
| EMAIL | $50.00/F |
| FUNDRAISING/NON-PROFIT | |
| MODEM/FTP/BBS (FLAT FEE) | $50.00/F |
| RUN CHARGES | $10.00/M |

**RELATED LISTS**
- MAYO CLINIC HEALTH LETTER
- THE SATURDAY EVENING POST
- HAMMACHER SCHLEMMER MAIL ORDER BUYERS
- SMITHSONIAN MAGAZINE
- AMERICAN DIABETES ASSOCIATION DONORS



- NET NAME IS ALLOWED($10.00/M RUN CHARGE)
- EXCHANGE IS AVAILABLE
- REUSE IS AVAILABLE
- CANCELLATION FEE AT $100.00/F

CHRISTIAN BOOK DISTRIBUTORS
CATALOG BUYERS
TOTALSOURCE PLUS - MASTERFILE
HABITAT FOR HUMANITY, INT'L
PARALYZED VETERANS OF AMERICA
PREMIUM DONOR MASTERFILE
BOARDROOM BOOK BUYERS

**Get Count**   **Get Pricing**   **Get More Information**