

21st Floor
1251 Avenue of the Americas
New York, NY 10020-1104

**Sharon L. Schneier**
212-603-6448 tel
212-489-8340 fax

sharonschneier@dwt.com

October 20, 2017

**By ECF & Federal Express**

The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY  10601-4150

Re:   *Ruppel v. Consumers Union of United States, Inc.*
      Case No.: 7:16-cv-2444-KMK-JCM (S.D.N.Y)

Dear Judge Karas:

Pursuant to II.A. of this Court's Individual Rules defendant Consumer Reports, Inc. ("Consumer Reports") requests a pre-motion conference in connection with its proposed motion for summary judgment, pursuant to Rule 56.

Consumer Reports is the publisher of *Consumer Reports* magazine.[1]  Plaintiff Donald Ruppel ("Plaintiff" or "Ruppel") purports to represent a class of Michigan citizens who "had their Personal Reading Information (PRI) disclosed to third parties by Consumers Union without consent."  Compl. ¶ 49.  Plaintiff bases his claim on the Michigan Video Rental Privacy Act ("VRPA" or the "Act"), M.C.L. §§ 445.1711, et seq., amended in 2016 to, *inter alia*, eliminate no-injury lawsuits.  According to Plaintiff, each Michigan resident whose name appeared on a subscriber list disclosed to a third party, including Consumer Reports' agents is entitled to the greater of $5,000 in statutory damages or actual damages, potentially subjecting Consumer Reports to millions of dollars in exposure.  The Michigan Legislature never intended the VRPA to be a tool for imposing crushing penalties on magazine publishers for doing what they have done for decades and for awarding a massive windfall to subscribers who have suffered no tangible injury.  Phase 1 discovery is complete and establishes that Consumer Reports is entitled to dismissal of all claims.

Discovery has demonstrated that Consumer Reports has not, as the Complaint summarily alleges, sold Mr. Ruppel's PRI to "data miners" and direct mail marketers leading to a deluge of junk mail, telephone solicitations and fraudulent "scams" attributable to Consumer Reports.  *See, e.g.*, Compl. ¶¶ 1, 7, 10, 42-44, 61, 62 and 70.  In fact, any transmissions of Plaintiff's PRI were to Consumer Reports' back office and service providers (under strict confidentiality) and/or as

---

[1] Consumer Reports is a nonprofit organization that has no owners, no shareholders, and no commercial investors. http://www.consumerreports.org/cro/about-us/index.htm.  Consumer Reports accepts no advertising revenue and pays for all the products it tests.  *Id.*  Consumer Reports is primarily supported by subscription revenue from its magazines, donations and bequests from individual consumers, cy pres awards, and grants from foundations and state attorneys general.  *Id.*  Consumer Reports ceased the complained of conduct even before suit was filed.

The Honorable Kenneth M. Karas
October 20, 2017
Page 2

expressly permitted by the Act. Consumer Reports' subscribers (including Plaintiff) were repeatedly advised that Consumer Reports shares subscriber information with third parties for marketing purposes and provides them with the opportunity and ability to easily opt-out of receiving third-party promotional mailings. Mr. Ruppel, who subscribed to *Consumer Reports* magazine and its online publication for ten years, and availed himself of the various available means to contact Consumer Reports, never complained about its marketing practices or opted-out. Accordingly, Consumer Reports is entitled to summary judgment on the following grounds:

First, Consumer Reports' conduct—disclosing subscriber information for the exclusive purpose of directly marketing goods and services where notice and opportunity to opt out of such disclosures was provided—expressly falls within the marketing exemption. The statute *expressly* permits disclosure of PRI as part of direct marketing to consumers provided "written notice" of such disclosure is provided. M.C.L. §445.1713(a), (d). *See Coulter-Owens v. Time, Inc.*, 695 Fed. Appx. 117, 120 (6th Cir. June 26, 2017) (use of PRI for list rental falls within statute's direct marketing exemption). ***Every*** print issue of *Consumer Reports* magazine during the ten year period that Plaintiff subscribed to the magazine, as well as Consumer Reports' online publication, contained the notice required by the Act. Consumer Reports' Privacy Policy on its website also contained and contains notices providing notice and opt-out instructions and information. Moreover, Consumer Reports has written extensively, in its magazine and online, about the need to review a company's privacy policies – articles Mr. Ruppel would have seen and read given his stated interest in privacy issues. Ruppel Dep. Tr. at 31:13-15; 37:19-25; 42:13-43:4; 67:22-68:10.

Second, the Act certainly does not prohibit a company from transmitting subscription data to its own employees and/or agents. Plaintiff's contention that Consumer Reports disclosure to third parties who provide Consumer Reports with service support is prohibited or actionable under the VRPA finds no support under the plain language of the statute. M.C.L. §445.1712. The VRPA restricts "disclosures" by a company *or* its "employees or agents" *to other* "persons" (unless the disclosure falls within a permitted exception). In *Boelter v. Hearst Comm., Inc.*, Nos. 15 Civ. 3934, 15 Civ. 9279, 2017 WL 3994934, *13-16, *20-21 (S.D.N.Y. Sept. 7, 2017), the court found that the VRPA does not prohibit disclosures made to an employer's employees or agents, including third parties that processes subscriber data, execute external transmissions and perform key tasks. These disclosures to Consumer Reports' agents are not prohibited under the VRPA, and are not actionable.

Third, interpreting or applying the VRPA to authorize or impose a $5,000 penalty for sharing truthful and, as Plaintiff admits, not embarrassing information about a customer's magazine subscription, violates the First Amendment. The Supreme Court in *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2227 (2015), affirmed that laws defining regulated speech by subject matter are content-based, and under *Reed*, such content-based regulations on speech are subject to strict constitutional scrutiny. However, even assuming the speech at issue is commercial speech subject to intermediate constitutional scrutiny, the VRPA cannot survive First Amendment scrutiny here. Michigan's interest in regulating speech through the VRPA can only be considered a substantial state interest to the extent it is limited to preventing ***public***

The Honorable Kenneth M. Karas
October 20, 2017
Page 3

disclosure of genuinely private information and there is no evidentiary basis to support a broader view.

Separately, even assuming the State's interest in preventing public disclosure of certain magazine purchasers' identities is substantial, the VRPA is not narrowly drawn. There are less speech-restrictive means of advancing the State's asserted privacy interest short of imposing liability on Consumer Reports for communicating basic subscription information to its agents and employees in a strictly confidential environment. Plaintiff also improperly attempts to draw a distinction between nonprofit and other companies, claiming the marketing exemption does not apply to nonprofit fundraising solicitations. This interpretation, if adopted, imposes further improper content- and speaker-based restrictions.[2] *See Matal v. TRM*, 137 S. Ct. 1744, 1764-65 (2017). To interpret the marketing exemption to apply to commercial solicitations, but not nonprofit fundraising, improperly restricts speech on the basis of the content and identity of the speaker in violation of the First Amendment. *See id.* at 1766 ("A subject that is first defined by content and then regulated or censored by mandating only one sort of comment is not viewpoint neutral."); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011) (finding because Vermont statute allowed information to be conveyed to and used by all but a narrow class of disfavored speakers, it impermissibly imposed both content-based and speaker-based restrictions on availability and use of prescriber-identifying information).

Fourth, Plaintiff must establish some actual damages in order to qualify to receive the $5,000 statutory award under the VRPA. This is plain from the language of the statute ("whichever is greater"), the Act's legislative history and the Michigan Attorney General's own statements. *See* M.C.L. §445.1715(a). Plaintiff suffered no injury. Plaintiff testified that he could not recall the last time he received junk mail, admitted he could not or did not identify any unwanted telephone or email solicitations and was "not embarrassed" by his subscription to *Consumer Reports* magazine. Ruppel Dep. Tr. 79:22-83:13, 126:6-18, 127:14-19, 144:6-8.

Fifth, Plaintiff's unjust enrichment claim is without substance.

Very truly yours,

Davis Wright Tremaine LLP

*/s/ Sharon L. Schneier*
Sharon L. Schneier

cc: All counsel of record (via ECF)

---

[2] Moreover, Plaintiff's argument that the marketing exemption does not apply when the mailer comes from a "charity," like St. Jude's Children's Hospital (as opposed to TV Guide) because St. Jude's is merely fundraising to support the organization's charitable purposes not only finds no support in the VRPA, it is nonsensical. It is also factually mistaken. These so-called nonprofit companies clearly provide "services" to consumers and they – like for profit companies – fall squarely within the VRPA's exemption. Further, discovery has shown that four of the offers from nonprofits sent to Mr. Ruppel also offered goods or services to customers as part of the mailers including, *inter alia*, labels, notecards, pens, the opportunity to purchase a tree, and health newsletters.

Anchorage | New York | Seattle
Bellevue | Portland | Shanghai
Los Angeles | San Francisco | Washington, D.C.

www.dwt.com