**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DON RUPPEL, individually and on behalf of all others similarly situated,

                    Plaintiff,

    v.

CONSUMERS UNION OF UNITED STATES, INC.,

                    Defendant.

Civil Action No. 16-cv-02444-KMK

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS, EXPENSES, AND INCENTIVE AWARD

Dated: September 18, 2018

**BURSOR & FISHER, P.A.**

Scott A. Bursor
Joseph I. Marchese
Philip L. Fraietta
888 Seventh Avenue
New York, NY  10019
Telephone:  (646) 837-7150
Facsimile:  (212) 989-9163
Email:  scott@bursor.com
        jmarchese@bursor.com
        pfraietta@bursor.com

Frederick J. Klorczyk III
1990 North California Blvd., Suite 940
Walnut Creek, CA  94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email:  fklorczyk@bursor.com

*Class Counsel*

# TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION ................................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND......................................... 2

    A.    Michigan's Preservation Of Personal Privacy Act ........................... 2

    B.    Plaintiff's Allegations ...................................................................... 3

    C.    The Litigation And Work Performed To Benefit The Class............. 4

SUMMARY OF THE SETTLEMENT ................................................................ 7

ARGUMENT .......................................................................................................... 7

I.      THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND
      SHOULD BE APPROVED ....................................................................... 7

    A.    The Percentage Method Should Be Used To Calculate Fees ................. 10

    B.    The Reasonableness Of The Requested Fees Is Supported By This
         Circuit's Six-Factor *Goldberger* Test ...................................................... 11

        1.    Time And Labor Expended By Counsel ..................................... 11

        2.    Magnitude And Complexity Of The Litigation ......................... 13

        3.    The Risk Of Litigation ................................................................ 14

        4.    The Quality Of Representation ................................................... 16

        5.    The Requested Fee In Relation To The Settlement ................... 17

        6.    Public Policy Considerations ...................................................... 17

    C.    The Requested Attorneys' Fees Are Also Reasonable Under A
         Lodestar Cross-Check...................................................................... 18

II.    THE REQUESTED INCENTIVE AWARD REFLECTS MR. RUPPEL'S
      ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE
      APPROVED ............................................................................................ 22

CONCLUSION....................................................................................................... 23

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*,
522 F.3d 182 (2d Cir. 2008)...................................................................... 9, 10

*Baffa v. Donaldson Lufkin & Jenrette Secs. Corp.*,
2002 WL 1315603 (S.D.N.Y. June 17, 2002) ........................................... 8

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ............................................................. 21

*Blum v. Stenson*,
465 U.S. 886 (1984)................................................................................. 19

*Cassese v. Williams*,
503 F. App'x 55 (2d Cir. 2012) ............................................................... 19

*City of Providence v. Aeropostale, Inc.*,
2014 WL 1883494 (S.D.N.Y. May 9, 2014) ........................................... 9

*Clark v. Ecolab, Inc.*,
2010 WL 1948198 (S.D.N.Y. May 11, 2010) ......................................... 9

*Coulter-Owens v. Time Inc.*,
695 F. App'x 117 (6th Cir. 2017) ............................................................ 14

*Dornberger v. Metro. Life Ins. Co.*,
203 F.R.D. 118 (S.D.N.Y. 2001) ............................................................ 23

*Ebin v. Kangadis Food Inc.*,
297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) .............................................. 16

*Eisen v. Carlisle & Jacquelin*,
417 U.S. 156 (1974)................................................................................. 18

*GB ex rel NB v. Tuxedo Union Free School Dist.*,
894 F. Supp. 2d 415 (S.D.N.Y. 2012)...................................................... 9

*Goldberger v. Integrated Resources, Inc.*,
209 F.3d 43 (2d Cir. 2000)............................................................... passim

*Hayes v. Harmony Gold Min. Co.*,
2011 WL 6019219 (S.D.N.Y. Dec. 2, 2011) ........................................... 9

*In re Beacon Assocs. Litig.*,
2013 WL 2450960 (S.D.N.Y. May 9, 2013) ........................................ 8, 10

*In re Citigroup Inc. Sec. Litig.*,
965 F. Supp. 2d 369 (S.D.N.Y. 2013)...................................................... 8

*In re Currency Conversion Fee Antitrust Litig.*,
 263 F.R.D. 110 (S.D.N.Y. Oct. 22, 2009) ................................................................ 23

*In re EVCI Career Colleges Holding Corp. Sec. Litig.*,
 2007 WL 2230177 (S.D.N.Y. July 27, 2007) ............................................................ 10

*In re Initial Public Offering Secs. Litig.*,
 671 F. Supp. 2d 467 (S.D.N.Y.2009) ........................................................................ 9

*In re Marsh ERISA Litig.*,
 265 F.R.D. 128 (S.D.N.Y. 2010) ........................................................................ 14, 17

*In re Merry-Go-Round Enters., Inc.*,
 244 B.R. 327 (Bankr. D.Md. 2000) .......................................................................... 21

*In re MetLife Demutalization Litig.*,
 689 F. Supp. 2d 297 (E.D.N.Y. 2010) ...................................................................... 17

*In re Nasdaq Market-Makers Antitrust Litig.*,
 187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................ 13, 14

*In re Telik, Inc. Sec. Litig.*,
 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ...................................................................... 14

*Khait v. Whirlpool Corp.*,
 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010) ............................................................ 9

*LeBlanc-Sternberg v. Fletcher*,
 143 F. 3d 748 (2d Cir. 1998) .................................................................................... 20

*Luciano v. Olsten Corp.*,
 109 F.3d 111 (2d Cir. 1997).................................................................................... 19

*Massiah v. MetroPlus Health Plan, Inc.*,
 2012 WL 5874655 (E.D.N.Y. Nov. 20, 2012) .................................................... 18, 22

*McDaniel v. County of Schenectady*,
 595 F.3d 411 (2d Cir. 2010).................................................................................... 8

*McMahon v. Olivier Cheng Catering & Events, LLC*,
 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ............................................................ 21

*Missouri v. Jenkins*,
 491 U.S. 274 (1989)................................................................................................ 20

*Parker v. Jekyll & Hyde Entm't Holdings, LLC*,
 2010 WL 532960 (S.D.N.Y. Feb. 9, 2010)................................................................ 21

*Parker v. Time Warner Entertainment Co., L.P.*,
 631 F. Supp. 2d 242 (E.D.N.Y. 2009) ...................................................................... 19

*Pennsylvania v. Del. Valley Citizens' Council for Clean Air*,
 478 U.S. 546 (1986)................................................................................................ 19

*Perdue v. Kenny A. ex rel. Winn*,
  559 U.S. 542 (2010) ................................................................................................ 10

*Raniere v. Citigroup Inc.*,
  310 F.R.D. 211 (S.D.N.Y. 2015) ............................................................................ 23

*Reyes v. Altamarea Grp.*,
  2011 WL 4599822 (S.D.N.Y. Aug. 16, 2011) ................................................. 10, 22

*Shapiro v. JPMorgan Chase 7 Co.*,
  2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........................................ 14, 16, 18, 19

*Varljen v. H.J. Meyers & Co., Inc.*,
  2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000) ........................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005) ............................................................................ 8, 11, 18

*Wilkins v. HSBC Bank Nevada, N.A.*,
  2015 WL 890566 (N.D. Ill. Feb. 27, 2015) ............................................................ 21

*Willix v. Healthfirst, Inc.*,
  2011 WL 754862 (E.D.N.Y. Feb. 18, 2011) ............................................................. 9

*Yuzary v. HSBC Bank USA, N.A.*,
  2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013) ....................................................... 7, 21

## STATUTES

M.C.L. § 445.1711 ............................................................................................................ 1

M.C.L. § 445.1712 ...................................................................................................... 1, 2

M.C.L. § 445.1715 ...................................................................................................... 1, 2

## RULES

Fed. R. Civ. P. 16 ............................................................................................................ 5

Fed. R. Civ. P. 23(h) .................................................................................................... 1, 7

Fed. R. Civ. P. 26 ............................................................................................................ 5

Fed. R. Civ. P. 26(a)(1) ................................................................................................... 5

## INTRODUCTION

The class action settlement between Plaintiff Don Ruppel and Defendant Consumers Union of United States, Inc. ("Consumer Reports"), if finally approved, resolves Plaintiff's and the Class' claims against Consumer Reports under Michigan's Preservation of Personal Privacy Act ("PPPA"), M.C.L. §§ 445.1711-1715.  Measured by expected class member recovery, the settlement is the largest ever reached in a PPPA case.[1]  The settlement – preliminarily approved by this Court on July 27, 2018 – creates a $16.375 million non-reversionary common fund from which class members will receive *pro rata* cash payments estimated to be approximately $180.

Obtaining this exceptional relief did not come easily.  Plaintiff shouldered significant risk and battled through two years of hard-fought litigation, involving complex factual investigation into Consumer Reports' disclosure practices, case-dispositive motion practice on novel legal issues, and complete Phase I discovery, including substantial document review and depositions of the Defendant and third parties.  Indeed, the settlement was not reached until the Parties were in the midst of briefing competing motions for summary judgment.

Moreover, the settlement was not reached until the Parties participated in two mediations with well-respected mediators at JAMS, including former Magistrate Judge Maas.  And, while the Parties ultimately achieved a settlement, it was only after weeks of continued negotiations after the second mediation.

In light of this exceptional result, Plaintiff respectfully requests pursuant to Federal Rule of Civil Procedure 23(h) that the Court approve attorneys' fees, costs, and expenses of one-third of the settlement fund, or $5,458,333.33, as well as an incentive award of $7,500 for Plaintiff for

---

[1] At the time the Proposed Settlement was reached, it was also the largest PPPA settlement ever reached in terms of total dollar recovery.  However, on July 12, 2018, the plaintiff in *Hearst* (who is represented by Class Counsel) moved for preliminary approval of a $50 million class-wide settlement.  *See Edwards v. Hearst Communications, Inc.*, Case No. 15-cv-09279-AT (S.D.N.Y.) at ECF No. 289.  The *Hearst* settlement is expected to provide claimants with monetary relief of approximately $155 each.  *See id.* at ECF No. 291.

his service as class representative.  Even though this settlement is much larger, the requested fee

is an equal percentage to that approved by this Court in *Taylor v. Trusted Media Brands, Inc.*,

No. 16-cv-01812-KMK, ECF No. 87 (S.D.N.Y. 2018) (awarding one-third of $8.225 million

settlement fund resolving plaintiff's PPPA claim), and is a <u>lesser</u> percentage than the 35% that

was approved in *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, ECF No. 81 (E.D. Mich.

2016) (awarding 35% of $7.5 million settlement fund resolving plaintiff's PPPA claim) and in

*Moeller v. American Media, Inc.*, No. 16-cv-11367-JEL, ECF No. 42 (E.D. Mich. 2017)

(awarding 35% of $7.6 million settlement fund resolving plaintiff's PPPA claim).

For these reasons, and as explained further below, this Court should approve the

requested fee and incentive award.

## FACTUAL AND PROCEDURAL BACKGROUND

A brief summary of the PPPA, the litigation performed by Class Counsel for the

Settlement Class' benefit, and the beneficial terms of the Settlement provide necessary context to

the reasonableness of the requested fee and incentive award.

### A.  Michigan's Preservation Of Personal Privacy Act

The Michigan legislature passed the PPPA "to preserve personal privacy with respect to

the purchase, rental, or borrowing of written materials, sound recordings, and video recordings."

M.C.L. § 445.1712.  As such, the PPPA provides that:

> a person, or an employee or agent of the person, engaged in the
> business of selling at retail . . . books or other written materials . . .
> shall not disclose to any person, other than the customer, a record
> or information concerning the purchase . . . of those materials by a
> customer that indicates the identity of the customer.

*Id.* § 445.1712.

To enforce the statute, the PPPA authorizes civil actions and provides for the recovery of

statutory damages in the amount of $5,000, plus costs and reasonable attorneys' fees.  *See id.*

§ 445.1715.

## B.   Plaintiff's Allegations

Consumer Reports is a non-profit organization that publishes *Consumer Reports* and other magazines in the United States.  *See* Plaintiff's Class Action Complaint, ECF No. 1 ["Compl."], ¶¶ 1 n.1, 11.  Plaintiff alleges that Consumer Reports sells information related to its customers' magazine subscription histories and personal reading habits.  *Id.* ¶¶ 1-4, 7-8, 42-48. To increase the value of such information, Plaintiff alleges that Consumer Reports trades its customers' protected reading information with certain third parties – including data mining companies – in exchange for other demographic and lifestyle data that such companies have already gathered (or "mined") on each subscriber.  *Id.* ¶¶ 7, 42.  Plaintiff further alleges that Consumer Reports thereafter "enhances" its own customer profiles with this additional data (*e.g.*, income levels, religion, age, race, political affiliation, travel habits, medical conditions, etc.), and then sells the enhanced information to other unrelated third parties for a profit.  *Id.* ¶¶ 7-8, 43-44.

Plaintiff further alleges that no matter how consumers subscribe (*i.e.*, via postcard, over the phone, on Consumer Reports' website, or through a subscription agent's website), Consumer Reports' customers never provide consent to disclose information related to their magazine subscriptions to third parties.  *Id.* ¶¶ 9, 45-46, 48.  This is because – during the subscription process – Plaintiff claims that customers are not required to consent to any terms or policies informing them of Consumer Reports' disclosure practices.  *Id.*  Likewise, even after subscribing, Plaintiff alleges that Consumer Reports fails to notify customers that it will disclose their protected reading information to third parties.  *Id.*  Nonetheless, Consumer Reports is allegedly in the business of disclosing all of their customers' protected reading information to various third parties, without any consent.  *Id.* ¶¶ 7-9, 45-46, 48.

###### C.     The Litigation And Work Performed To Benefit The Class

In June 2015, Class Counsel began what would be an eight-month pre-suit investigation into Consumer Reports' alleged data-sharing practices.  *See* Declaration of Joseph I. Marchese ("Marchese Decl.") ¶ 3.  While that investigation was ongoing, the Michigan State Senate passed a bill to amend the PPPA and *Spokeo v. Robins* – a case regarding Article III standing in statutory cases – was then pending before the Supreme Court.  *Id.* ¶¶ 4-5.  Knowing both of these events would impact the litigation, Plaintiff filed his class action lawsuit on April 1, 2016, and Consumer Reports has vigorously defended itself from the outset, seizing on both issues. *Id.* ¶¶ 6, 9.  On April 12, 2016, the Michigan House of Representatives passed the bill to amend the PPPA, and on May 16, 2016, the Supreme Court issued its opinion in *Spokeo*.  *Id.* ¶¶ 7-8.

On August 12, 2016, after the Parties appeared before the Court for a premotion conference on Consumer Reports' motion to dismiss, Consumer Reports served its motion to dismiss arguing that:  (1) Plaintiff lacked Article III standing because he failed to allege an injury-in-fact; (2) the PPPA, as amended, removed the statutory damage's provision, and that amendment applies retroactively; (3) Defendant's alleged disclosures are permitted by the PPPA's direct marketing defense; and (4) the PPPA is overbroad and void under the First Amendment.  *Id.* 15.  These legal arguments were novel, and had previously been addressed only in *Boelter v. Hearst Communications, Inc.*, No. 15-cv-03934-AT (S.D.N.Y.), *Boelter v. Advance Magazine Publishers. Inc. d/b/a Condé Nast*, No. 15-cv-05671-NRB (S.D.N.Y.), and *Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK (S.D.N.Y.), three similar cases under the PPPA in which Class Counsel served as Plaintiff's counsel.  *Id.* ¶¶ 10-11.  Plaintiff opposed Consumer Reports' motion on September 8, 2016, and Class Counsel was able to incorporate some of its work product from *Hearst*, *Condé Nast*, and *Trusted Media Brands* in doing so.  *Id.* ¶ 16.

On October 20, 2016, the Court held an initial scheduling conference pursuant to Fed. R. Civ. P. 16 and thereafter entered a Scheduling Order. *Id.* ¶ 20. The Parties then exchanged their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), conducted substantial written and document discovery on the merits of the case, produced and reviewed thousands of pages of documents, and engaged in several meet and confer conferences, all while Consumer Reports' motion to dismiss remained pending. *Id.* ¶¶ 21-23, 25, 27-29.

From the outset of the case, and including during the pendency of the motion to dismiss, the Parties engaged in direct communications, and as part of their obligations under Fed. R. Civ. P. 26, discussed the prospect of resolution. *Id.* ¶ 30. To that end, on February 1, 2017, Plaintiff served a 12-page single-spaced settlement letter detailing the strengths of Plaintiff's claims and outlining a framework for class-wide settlement on defense counsel. *Id.* ¶ 32. The letter sparked discussions between the Parties, but the discussions ultimately were not fruitful. *Id.* ¶ 33.

Thereafter, Plaintiff served subpoenas on multiple third parties who he believed were recipients of Defendant's subscriber data disclosures, served requests for admissions on Defendant, and engaged in discovery disputes with Defendant and a third party. *Id.* ¶¶ 34-37. After that, the Parties engaged in deposition discovery, which included depositions of the Parties, as well as two third party witnesses. *Id.* ¶ 38. Plaintiff also obtained a declaration from another third party in lieu of a deposition. *Id.*

On June 12, 2017, the Court entered an Order denying Defendant's motion to dismiss in its entirety. *Id.* ¶ 39 (citing ECF No. 68). On July 31, 2017, the Court held a status conference at which the Parties informed the Court that Phase I discovery had been completed, and that they intended to engage in a mediation with Jed Melnick, Esq., who is a neutral mediator affiliated with JAMS New York. *Id.* ¶ 41. The mediation with Mr. Melnick occurred on August 28, 2017

at JAMS's offices in New York and lasted a full day.  While the Parties engaged in good faith

negotiations, which at all times were at arms' length, they failed to reach an agreement.  *Id.* ¶ 43.

On September 1, 2017, the Parties wrote to the Court requesting an additional thirty days

to continue their settlement negotiations, and the Court granted that request.  *Id.* ¶ 44 (citing ECF

No. 74).  However, those continued settlement negotiations did not result in an agreement.

On October 20, 2017, the Parties filed premotion letters in support of their motions for

summary judgment.  *Id.* ¶ 46 (citing ECF Nos. 77 & 79).  And on October 27, 2017, the Parties

filed responses to their respective letters.  *Id.* (citing ECF Nos. 81 & 83).  On December 5, 2017,

the Court held a premotion conference and granted both Parties permission to file their motions

for summary judgment.  *Id.* ¶ 47.  The Court thereafter set a briefing schedule for the motions.

*Id.* (citing ECF No. 91).

On February 9, 2018, the Parties served their motions for summary judgment and

supporting documents.  *Id.* ¶ 48.  Shortly thereafter, the Parties agreed to participate in a second

mediation, which the Parties agreed would take place before former U.S. Magistrate Judge Frank

Maas (of the U.S. District Court for the Southern District of New York), who is a neutral

mediator affiliated with JAMS New York.  *Id.* ¶ 49.  The mediation with Judge Maas took place

on February 21, 2018 at JAMS's offices in New York and lasted a full day.  *Id.* ¶ 51.  While the

Parties engaged in good faith negotiations, which at all times were at arms' length, they were

unable to reach an agreement that day.  But the Parties agreed to continue their settlement

negotiations at the conclusion of the mediation.  *Id.*

Thereafter, the Parties continued to engage in settlement negotiations and, on the verge of

serving their opposition papers to each other's motions for summary judgment, reached an

agreement.  *Id.* ¶ 53.

## SUMMARY OF THE SETTLEMENT

Class Counsel's efforts resulted in the largest settlement, measured by expected class member recovery (and at the time by total dollar amount as well), ever achieved under the PPPA. *Id.* ¶ 54. The Settlement provides an exceptional result for the class by delivering immediate cash to approximately 560,474 persons with a Michigan street address who between April 1, 2010 and October 31, 2016, purchased or had a subscription to a Consumer Reports Publication. *Id.* The Settlement creates a non-reversionary $16,375,000 Settlement Fund, from which class members will receive a *pro rata* cash payment, which Class Counsel estimates will be approximately $180. *Id.* Ex. A, Class Action Settlement Agreement ("Agreement") ¶¶ 1.33, 2.1; *see also* Marchese Decl. ¶ 54.

## ARGUMENT

### I.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED

The requested fee award of $5,458,333.33, representing one-third of the common fund, is reasonable and merits approval. Under Federal Rule of Civil Procedure 23(h), courts may award "reasonable attorney's fees and nontaxable costs that are authorized by law or the parties' agreement." Fed. R. Civ. P. 23(h).[2] Here, the Settlement Agreement between the Parties provides that Class Counsel may petition the Court for an award up to one-third of the Settlement Fund. Agreement ¶ 8.1.

In common-fund cases such as this one, courts in the Second Circuit apply one of two fee

---

[2] The requested fee award also encompasses unreimbursed litigation costs and expenses. Agreement ¶ 8.1. Reasonable litigation-related costs and expenses are customarily awarded in common fund cases and include costs such as document preparation and travel. *See, e.g.*, *Yuzary v. HSBC Bank USA, N.A.*, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) ("Class Counsel's unreimbursed expenses, including court and process server fees, postage and courier fees, transportation, working meals, photocopies, electronic research, expert fees, and Plaintiffs' share of the mediator's fees, are reasonable and were incidental and necessary to the representation of the class."). Thus, included in the requested fee award, Class Counsel respectfully seeks reimbursement of $43,869.62 for out-of-pocket costs and expenses in these standard categories. *See* Marchese Decl. ¶ 67, Ex. C.

calculation methods – the "percentage of the fund" method or the "lodestar" method.  *See*

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000).  The Court has

discretion in choosing which method to employ.  *See McDaniel v. County of Schenectady*, 595

F.3d 411, 419 (2d Cir. 2010) (holding that "the decision as to the appropriate method [is left] to

'the district court, which is intimately familiar with the nuances of the case'") (quoting

*Goldberger*, 209 F.3d at 48).   "[T]he trend in this Circuit has been toward the use of a percentage

of recovery as the preferred method of calculating the award for class counsel in common fund

cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013); *see also*

Marchese Decl. Ex. L, 1/31/18 *Trusted Media Brands* Final Approval Hearing Transcript

("*TMBI* Hearing Tr.") at 16-18 (applying percentage of the fund method in a PPPA case).   In

fact, the "trend" of using the percentage of the fund method to compensate class counsel is now

"firmly entrenched in the jurisprudence of this Circuit."  *In re Citigroup Inc. Sec. Litig.*, 965 F.

Supp. 2d 369, 388 (S.D.N.Y. 2013).  As the Second Circuit has stated, the percentage method

"directly aligns the interests of the class and its counsel and provides a powerful incentive for the

efficient prosecution and early resolution of litigation."  *Wal-Mart Stores, Inc. v. Visa U.S.A.,*

*Inc.*, 396 F.3d 96, 121 (2d Cir. 2005).  "In contrast, the 'lodestar create[s] an unanticipated

disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district

courts to engage in gimlet-eyed review of line-item fee audits.'"  *Id.* (quoting *Baffa v. Donaldson*

*Lufkin & Jenrette Secs. Corp.*, 2002 WL 1315603, at *1 (S.D.N.Y. June 17, 2002)).  Indeed, over

a decade ago, the Second Circuit described difficulties with the lodestar method:

> As so often happens with simple nostrums, experience with the
> lodestar method proved vexing.  Our district courts found it created
> a temptation for lawyers to run up the number of hours for which
> they could be paid.  For the same reason, the lodestar created an
> unanticipated disincentive to early settlements.  But the primary
> source of dissatisfaction was that it resurrected the ghost of
> Ebenezer Scrooge, compelling district courts to engage in a gimlet-

> eyed review of line-item fee audits.  There was an inevitable waste
> of judicial resources.

*Goldberger*, 209 F.3d at 48-49.  This Court has also been critical of the lodestar method, and has

noted that "courts in the Second Circuit no longer use the 'lodestar' method for computing

attorneys' fees" in fee-shifting cases.  *GB ex rel NB v. Tuxedo Union Free School Dist.*, 894 F.

Supp. 2d 415, 427 (S.D.N.Y. 2012) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n*

*v. County of Albany*, 522 F.3d 182 (2d Cir. 2008)); *see also TMBI* Hearing Tr. at 16:18-19

("Now, the lodestar method is not supposed to be used for computing attorneys' fees.").

Moreover, Courts in this Circuit routinely approve fee requests for one-third of a

common fund.  *See TMBI* Hearing Tr. at 17:21-22 ("As I said, it's one-third.  That's typically

approved by other courts."); *see also Hayes v. Harmony Gold Min. Co.*, 2011 WL 6019219, at *1

(S.D.N.Y. Dec. 2, 2011) (awarding "attorneys' fees in the amount of one third" of a $9 million

settlement fund), *aff'd* 509 F. App'x 21, 23-24 (2d Cir. 2013) (affirming fee award, and noting

that "the prospect of a percentage fee award from a common fund settlement, as here, aligns the

interests of class counsel with those of the class"); *In re Initial Public Offering Secs. Litig.*, 671

F. Supp. 2d 467, 516 (S.D.N.Y.2009) (awarding one-third of the $510 million net settlement

fund); *City of Providence v. Aeropostale, Inc.*, 2014 WL 1883494, at *20 (S.D.N.Y. May 9,

2014) (awarding 33% of $15 million settlement fund); *Khait v. Whirlpool Corp.*, 2010 WL

2025106, at *8 (E.D.N.Y. Jan. 20, 2010) (awarding 33% of $9.25 million settlement fund);

*Willix v. Healthfirst, Inc.*, 2011 WL 754862, at *6–7 (E.D.N.Y. Feb. 18, 2011) (awarding one-

third of $7.675 million settlement fund); *Clark v. Ecolab, Inc.*, 2010 WL 1948198, at *8–9

(S.D.N.Y. May 11, 2010) (awarding one-third of $6 million settlement fund).  Indeed, as courts

in this Circuit have noted, fee requests for one-third of common funds represent what

"reasonable, paying client[s] … typically pay … of their recoveries under private retainer

agreements." *Reyes v. Altamarea Grp.*, 2011 WL 4599822, at *8 (S.D.N.Y. Aug. 16, 2011)

(citing *Arbor Hill*, 522 F.3d 182).

### A.    The Percentage Method Should Be Used To Calculate Fees

As aforementioned, the "trend in this Circuit has been toward the use of a percentage of

recovery as the preferred method of calculating the award for class counsel in common fund

cases." *In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *5 (S.D.N.Y. May 9, 2013).  Indeed,

the percentage method has been used to calculate fees for the five other major PPPA class action

settlements, including by this Court.  *See TMBI* Hearing Tr. at 16-18 (applying percentage

method); *Halaburda v. Bauer Publ'g Co., L.P.*, No. 12-cv-12831-GCS, ECF No. 68 (E.D. Mich.

2015) (same); *Kinder v. Meredith Corp.*, No. 14-cv-11284-TLL, ECF No. 81 (E.D. Mich. 2016)

(same); *Coulter-Owens v. Rodale, Inc.*, No. 14-cv-12688-RHC, ECF No. 54 (E.D. Mich. 2016)

(same); *Moeller v. American Media, Inc.*, No. 16-cv-11367-JEL, ECF No. 42 (E.D. Mich. 2017)

(same).  In contrast, the lodestar approach is more often applied in federal fee-shifting cases,

particularly civil rights actions.  *See, e.g.*, *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551

(2010).  As Judge Cote has stated, the percentage method is preferred for several reasons:

> First, it relieves the court of the cumbersome, enervating, and often
> surrealistic process of evaluating fee petitions.  Second, it
> decreases plaintiff lawyers' incentive to run up the number of
> billable hours for which they would be compensated by the
> lodestar method.  And finally, it decreases the incentive to delay
> settlement because the fee for the plaintiffs' attorneys does not
> increase with delay.

*Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at *5 (S.D.N.Y. Nov. 8, 2000) (internal

citations omitted); *see also In re EVCI Career Colleges Holding Corp. Sec. Litig.*, 2007 WL

2230177, at *16 (S.D.N.Y. July 27, 2007) ("From a public policy perspective, the percentage

method is the most efficient means of compensating the work of class action attorneys.  It does

not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result.").

Under the circumstances of this case – wherein Class Counsel received an exceptional result for the Settlement Class – the Second Circuit prefers the percentage method. *See Wal-Mart Stores, Inc.*, 396 F.3d at 121 (noting that the percentage method "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation"). In contrast, "the lodestar create[s] an unanticipated disincentive to early settlements, tempt[s] lawyers to run up their hours, and compel[s] district courts to engage in gimlet-eyed review of line-item fee audits." *Id.* at 121 (quotation omitted).

### B. The Reasonableness Of The Requested Fees Is Supported By This Circuit's Six-Factor *Goldberger* Test

The Second Circuit has articulated six factors that should be considered when determining the reasonableness of a requested percentage to award as attorneys' fees: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation…; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Goldberger*, 209 F.3d at 50. A review of these factors support Class Counsel's fee request.

#### 1. Time And Labor Expended By Counsel

Class Counsel has been working on this case since June 2015, when it began investigating magazine publishers' violations of the PPPA. *See* Marchese Decl. ¶ 3. The pre-suit investigation was extensive, spanning eight months, and involving in-depth research into a number of data industry practices, including data appending and data cooperatives. *Id.* During that pre-suit investigation, Class Counsel also conducted extensive research into the Supreme Court's Article III standing precedents, in light of the Supreme Court granting *certiorari* in

*Spokeo v. Robins*, and also conducted extensive research into the retroactive application of statutory amendments under Michigan law, in light of the Michigan State Senate having begun work on a bill to amend the PPPA. *Id.* ¶¶ 4-5. Class Counsel also drafted the complaint, engaged in dispositive motion practice on novel legal issues, served and responded to discovery requests, conducted meet-and-confer teleconferences with defense counsel, reviewed thousands of pages of documents, engaged in third party discovery and discovery disputes, and conducted depositions of the Parties and two other third party witnesses. *Id.* ¶¶ 6-29; 34-38. Class Counsel also obtained a declaration from another third party in lieu of a deposition, in order to maximize efficiencies. *Id.* ¶ 38. Moreover, Class Counsel drafted and served a motion for summary judgment along with supporting documents, and substantially completed drafts of opposition papers to Defendant's motion for summary judgment. *Id.* ¶¶ 46-48, 52.

Further, Class Counsel expended considerable time and labor on the settlement process as well. First, Class Counsel thoroughly analyzed Defendant's applicable insurance policies and considered them in crafting a litigation and settlement strategy going forward. *Id.* ¶ 31. Then, on February 1, 2017, Class Counsel served on Defendant's counsel a 12-page single-spaced settlement letter detailing the strengths of Plaintiff's case and outlining a framework for class-wide settlement. *Id.* ¶ 32. Next, on August 28, 2017, Class Counsel participated in a full-day mediation with Mr. Melnick. *Id.* ¶ 43. In preparation for that mediation, Class Counsel prepared a detailed mediation statement outlining the strength of the Plaintiff's case, and comparing his case with other PPPA cases against magazine publishers that had settled, in order to help evaluate any potential settlement. *Id.* ¶ 42. Next, on February 21, 2018, Class Counsel participated in a second full-day mediation with Judge Maas. *Id.* ¶ 51. Again, in preparation for that mediation Class Counsel updated its previous mediation statement. *Id.* ¶ 49. Finally, over the next few weeks, Class Counsel continued to negotiate with Defendant's counsel and

ultimately reached the instant Settlement – which is the largest ever in a PPPA case measured by expected class member recovery, and at the time, was the largest ever measured by total dollars as well.  *Id.*¶¶ 53-54.

Thus, the work performed by Class Counsel to date has been comprehensive, complex, and wide ranging.  This factor supports the requested fee award.

### 2.    Magnitude And Complexity Of The Litigation

"[C]lass actions have a well deserved reputation as being most complex."  *In re Nasdaq Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 477 (S.D.N.Y. 1998) (internal citation and quotations omitted).  This case was no exception, both factually and legally.  This case involved multiple layers of factual complexity, much of which was obscured at the outset due to Consumer Reports' alleged concealment of its data sharing practices from consumers.  As a result, this required extensive preliminary investigation into Consumer Reports' business practices, their methods of data collection and aggregation, and the nature of their relationships with various third-party data companies.  Marchese Decl. ¶¶ 3, 21, 27-28, 34.

The case involved complex legal issues as well.  Consumer Reports challenged the basis of the lawsuit on constitutional grounds, based on new case law that did not even exist at the time of filing.  *Id.* ¶ 15.  Consumer Reports also challenged the basis of the lawsuit on statutory grounds, as the PPPA was amended after the case was filed.  *Id.*  And Consumer Reports challenged the lawsuit by arguing that:  (1) Consumer Reports' alleged disclosures were permitted by the PPPA's direct marketing defense; and (2) the PPPA is overbroad and void under the First Amendment.  *Id.*  Even after that motion was denied, Consumer Reports continued to challenge liability and the constitutionality of the PPPA, and it asserted a number of other defenses in its motion for summary judgment.  *Id.* ¶¶ 46-47.  If its summary judgment motion would have been ultimately denied, Plaintiff was keenly aware that Consumer Reports

would continue to challenge liability and the constitutionality of the PPPA, as well as assert a

number of defenses.  Consumer Reports indicated that it would continue to assert numerous

defenses on the merits, including that the PPPA neither prohibits the disclosure of the magazine

information at issue (because the recipients of the disclosures are its agents), nor applies to

Consumer Reports at all because it is not engaged in the business of selling magazines "at retail,"

as is required to come under the scope of the PPPA.  Consumer Reports would have also

continued to challenge Plaintiff's standing, as well as the constitutionality of the PPPA, and its

applicability to magazines in particular and the magazine publishing industry in general.  *Id.*

¶ 60.  Consumer Reports also would have vigorously contested the certification of a litigation

class.  *Id.*

In the end, because this case involved complex factual and legal questions under the

PPPA – its application to Defendant and its alleged disclosures, the constitutionality of the

underlying statute, and defining the scope of what it means to sell a magazine "at retail," an issue

which was ultimately decided unfavorably for Plaintiff by the Sixth Circuit in *Coulter-Owens v.*

*Time Inc.*, 695 F. App'x 117, 124 (6th Cir. 2017) – the magnitude and complexity of the

litigation further supports the requested fee award.

### 3.    The Risk Of Litigation

This factor recognizes the risk of non-payment in cases prosecuted on a contingency

basis where claims are not successful, which can justify higher fees.  *See, e.g., In re Marsh*

*ERISA Litig.*, 265 F.R.D. 128, 148 (S.D.N.Y. 2010) ("There was significant risk of non-payment

in this case, and Plaintiffs' Counsel should be rewarded for having borne and successfully

overcome that risk."); *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 592 (S.D.N.Y. 2008)

(noting risk of non-payment in cases brought on contingency basis).  "It is well settled that class

actions are notoriously complex and difficult to litigate."  *Shapiro v. JPMorgan Chase 7 Co.*,

2014 WL 1224666, at *21 (S.D.N.Y. Mar. 24, 2014) (internal citation omitted).  This case presented a substantial risk of non-payment for Class Counsel.

For over two years, Class Counsel invested significant time, effort, and resources to the litigation without any compensation.  Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation of Consumer Reports' practices, engaged in dispositive motion practice, and completed Phase I discovery.  *Id.* ¶¶ 3, 6-29; 34-38, 41.  Class Counsel also filed this case with *Spokeo* pending, and with the Michigan State Senate having just passed a bill to amend the PPPA, either of which could have been dispositive on the case.  *Id.* ¶¶ 4-5.  Additionally, Class Counsel also paid for and participated in two full-day mediations, as well as weeks of additional discussions with the mediators in order to try and resolve the action.  *Id.* ¶¶ 42-44, 49-51.  Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case.  *Id.* ¶¶ 3, 6-29; 34-38.  And given the defenses mounted by Consumer Reports, as well as the fairly limited history of PPPA litigation, success on the legal issues presented by this case was far from certain.  *Id.* ¶¶ 3-18, 26, 45-48.  Moreover, Class Counsel faced highly qualified defense counsel, who themselves have represented leading magazine publishers in related PPPA litigation.  *See, e.g.*, *Halaburda*, No. 12-cv-12831-GCS (E.D. Mich.).

Furthermore, Class Counsel took this case despite knowing that Consumer Reports is a nonprofit organization that has no owners, shareholders, or commercial investors.  *See, e.g.*, 10/20/17 Letter to Court, ECF No. 79 at 1 n.1.  Thus, there is reasonable doubt that Consumer Reports would be able to withstand a greater judgment.

The fact that Class Counsel undertook this representation, despite the significant risk of nonpayment, supports the requested fee award.

### 4.      The Quality Of Representation

Class action litigation presents unique challenges and – by achieving the largest expected class member recovery ever in a PPPA case – Class Counsel proved that they have the ability and resources to litigate this case zealously and effectively.  In addition, Class Counsel are well-respected attorneys with significant experience litigating consumer class actions of similar size, scope, and complexity.  Marchese Decl. ¶ 74, Ex. M.  Class Counsel also served as Class Counsel in *Taylor v. Trusted Media Brands, Inc.*, No. 16-cv-01812-KMK (S.D.N.Y.), a case brought under the PPPA wherein this Court approved a class-wide settlement for $8.225 million, and in *Moeller v. American Media, Inc.*, No. 16-cv-11368-JEL (E.D. Mich.), a case brought under the PPPA wherein Judge Levy approved a class-wide settlement for $7.6 million.  *Id.* Class Counsel is also counsel for plaintiffs in two other PPPA putative class actions pending in this District, wherein it reached proposed class-wide settlements which are pending preliminary approval.  *See Hearst*, No. 15-cv-09279-AT (S.D.N.Y.) at ECF No. 289 (motion for preliminary approval of a $50 million class-wide settlement); *Condé Nast*, No. 15-cv-05671-NRB (S.D.N.Y.) at ECF No. 122 (motion for preliminary approval of $13.75 million class-wide settlement).  Both *Hearst* and *Condé Nast* survived motions to dismiss, *see* Marchese Decl. ¶¶ 12, 18, and Judge Torres granted Plaintiff's motion for partial summary judgment in *Hearst*.  *Id.* ¶ 45.

Moreover, Class Counsel has been recognized by courts across the country for its expertise.  *See* Firm Resume, Marchese Decl. Ex. M; *see also Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) (Rakoff, J.) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008."); *In re Michaels Stores Pin Pad Litigation*, No. 11-cv-03350, ECF No. 22 (N.D. Ill. June 8, 2011) (appointing Bursor & Fisher

class counsel to represent a putative nationwide class of consumers who made in-store purchases at Michaels using a debit or credit card and had their private financial information breached as a result).

Furthermore, "[t]he quality of the opposition should be taken into consideration in assessing the quality of the plaintiffs' counsel's performance." *In re MetLife Demutalization Litig.*, 689 F. Supp. 2d 297, 362 (E.D.N.Y. 2010). Class Counsel achieved an exceptional result in this case while facing well-resourced and experienced defense counsel. *See Marsh ERISA Litig.*, 265 F.R.D. at 148 ("The high quality of defense counsel opposing Plaintiffs' efforts further proves the caliber of representation that was necessary to achieve the Settlement.").

Class Counsel litigated this case efficiently, effectively, and civilly. The excellent result is a function of the high quality of that work, which supports the requested fee award.

### 5. The Requested Fee In Relation To The Settlement

Class Counsel seeks fees, costs, and expenses totaling one-third of the $16.375 million settlement fund. As aforementioned, courts in this Circuit routinely approve fee requests for one-third of a common fund. *See supra* cases cited in Argument § I. Moreover, the requested fees, costs, and expenses of one-third of the settlement fund is an equal percentage to that approved by this Court in *Trusted Media Brands*, No. 16-cv-01812-KMK, ECF No. 87 (S.D.N.Y. 2018) (awarding one-third of $8.225 million settlement fund), and is a lesser percentage than the 35% that was approved in *Kinder*, No. 14-cv-11284-TLL, ECF No. 81 (E.D. Mich. 2016) (awarding 35% of $7.5 million settlement fund) and in *Moeller*, No. 16-cv-11367-JEL, ECF No. 42 (E.D. Mich. 2017) (awarding 35% of $7.6 million settlement fund). This factor thus supports the requested fee award.

### 6. Public Policy Considerations

The final *Goldberger* factor is public policy. "Skilled counsel must be incentivized to

pursue complex and risky claims [that protect the public on a contingency basis]." *Shapiro*, 2014 WL 1224666, at *24. As such, reasonable fee awards must be provided in order to ensure that attorneys are incentivized to litigate class actions, which serve as private enforcement tools to police defendants who engage in misconduct. *See id.* "Attorneys who fill the private attorney general role must be adequately compensated for their efforts," otherwise the public risks an absence of a "remedy because attorneys would be unwilling to take on the risk." *Massiah v. MetroPlus Health Plan, Inc.*, 2012 WL 5874655, at *7 (E.D.N.Y. Nov. 20, 2012) (citing *Goldberger*, 209 F.3d at 51). Further, when individual class members seek a relatively small amount of statutory damages, "economic reality dictates that [their] suit proceed as a class action or not at all." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect the privacy of consumers' personal reading choices. In fact, class action litigation in this area is the most realistic means of safeguarding the privacy of readers under the PPPA, especially because consumers are generally unaware that their privacy rights are being violated by these data sharing practices (here, Plaintiff alleged that Consumer Reports secretly disclosed its customers' personal reading information). *See also TMBI* Hearing Tr. at 17:23-25 ("Here the private Attorney General role is something that does merit compensation and this case is another example of that."). Thus, the alternative to a class action in this case would have been no enforcement at all, and Consumer Reports' allegedly unlawful conduct would have continued unabated. This factor thus supports the requested fee award.

## C.   The Requested Attorneys' Fees Are Also Reasonable Under A Lodestar Cross-Check

A lodestar cross-check further supports the requested fee. Courts applying the lodestar method generally apply a multiplier to take into account the contingent nature of the fee, the risks of non-payment, the quality of representation, and the results achieved. *See Wal–Mart*

*Stores, Inc.*, 396 F.3d at 121.  Where the lodestar is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Goldberger*, 209 F.3d at 50; *see also Cassese v. Williams*, 503 F. App'x 55, 59 (2d Cir. 2012) (noting the "need for exact [billing] records [is] not imperative" where the lodestar is used as a "mere cross-check").

To calculate lodestar, counsel's reasonable hours expended on the litigation are multiplied by counsel's reasonable rates.  *See Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986); *Blum v. Stenson*, 465 U.S. 886, 897 (1984); *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 264 (E.D.N.Y. 2009).  The resulting figure may be adjusted at the court's discretion by a multiplier, taking into account various equitable factors.  *See Parker*, 631 F. Supp. 2d at 264; *Shapiro*, 2014 WL 1224666, at *24 ("Additionally, under the lodestar method, a positive multiplier is typically applied to the lodestar in recognition of the risk of litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.") (internal quotations and citations omitted).

The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate."  *See Blum*, 465 U.S. at 895; *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 115-116 (2d Cir. 1997) ("The 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'") (alteration in original and citation omitted).  Here, the hourly rates used by Class Counsel are comparable to rates charged by attorneys with similar experience, skill, and reputation, for similar services in the New York

legal market.  *See* Marchese Decl. ¶¶ 68-72.[3]

The hours worked, lodestar fee, and expenses for Class Counsel are set forth in the declaration of Mr. Marchese, submitted herewith.  These records confirm Class Counsel's efficient billing.  For example, Class Counsel strives to assign as much work as possible to less senior lawyers or paralegals who bill at lower hourly rates in order to minimize fees for the Class.  Approximately 58% of Class Counsel's hours (697.7 hours) were billed by associates or paralegals.  *Id.* ¶ 64.  However, this was a complex case that involved a lot of novel legal issues, which required some involvement by more experienced lawyers.  Thus, Class Counsel's partners billed approximately 42% of the total hours (512.3 hours), primarily on the pre-suit investigation, developing the litigation strategy, deposing witnesses and defending depositions, drafting briefs on dispositive motions, making court appearances, attending mediations, and negotiating the settlement.  *See id.*

Thus, even under the optional lodestar cross check, Class Counsel's requested fees are reasonable given the unique circumstances of this case.  Specifically:

- Class Counsel obtained the largest ever expected class member recovery (and at the time the largest ever total dollar recovery as well) of a PPPA claim, which will result in class members receiving a substantial amount of money quickly.

- The litigation was conducted and the settlement was obtained in an efficient manner, by experienced and qualified counsel.

- The case involved complex and novel legal issues and factual theories, which involved significant litigation risks.

- Class Counsel devised a litigation and settlement strategy that factored in the complex and uncertain nature of the case, and Consumer Reports' available

---

[3]  The Supreme Court and other courts have held that the use of current rates is proper since such rates compensate for inflation and the loss of use of funds. *See Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (recognizing "an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise"); *LeBlanc-Sternberg v. Fletcher*, 143 F. 3d 748, 764 (2d Cir. 1998) ("The lodestar should be based on 'prevailing market rates' … and current rates, rather than historical rates, should be applied in order to compensate for the delay in payment.") (citation omitted).

insurance coverage and nonprofit status.

In total, through September 17, 2018, Class Counsel billed 1,210 hours, which at their hourly rates amounts to a lodestar of $661,687.50.  *See id.* ¶ 65.  Therefore, the requested fee award reflects an 8.18 times multiplier on Class Counsel's regular hourly rates.  This multiplier is lower than the 11.7 times multiplier approved by this Court in *Trusted Media Brands*.  *See TMBI* Hearing Tr. at 18:4-12.  And other courts across the country approve multipliers in this range – and even higher – in statutory privacy cases.  *See, e.g.*, *Wilkins v. HSBC Bank Nevada, N.A.*, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) (approving 11.03 lodestar multiplier in a TCPA case); *see also In re Merry-Go-Round Enters., Inc.*, 244 B.R. 327, 335 (Bankr. D.Md. 2000) (approving 19.6 lodestar multiplier).  As this Court has noted, "a high multiplier 'should not result in penalizing plaintiffs' counsel for achieving an early settlement, particularly where, as here, the settlement amount was substantial.'"  *TMBI* Hearing Tr. at 18:8-11 (quoting *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013)).  Moreover, due to Consumer Reports' available insurance coverage and nonprofit status, Class Counsel recognized that an efficient settlement was the best result for the class members, as continued litigation would have only derogated from Consumer Reports' insurance coverage.

Class Counsel's lodestar multiplier is also reasonable because it will decrease over time.  "[A]s class counsel is likely to expend significant effort in the future implementing the complex procedure agreed upon for collecting and distributing the settlement funds, the multiplier will diminish over time."  *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 WL 532960, at *2 (S.D.N.Y. Feb. 9, 2010).  Here, "[t]he fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for time that they will be required to spend administering the settlement going forward, also supports their fee request."  *Yuzary*, 2013 WL 5492998, at *11 (quoting *McMahon v. Olivier Cheng Catering & Events, LLC*, 2010 WL

21

2399328, at *8 (S.D.N.Y. Mar. 3, 2010)).

In sum, Class Counsel's efforts in this case resulted in the largest expected per class member recovery ever (and at the time the largest total dollar recovery ever as well) in a PPPA case. Class Counsel should be rewarded for achieving this result.

## II.   THE REQUESTED INCENTIVE AWARD REFLECTS MR. RUPPEL'S ACTIVE INVOLVEMENT IN THIS ACTION AND SHOULD BE APPROVED

Incentive awards are common in class action cases and serve to "compensate plaintiffs for the time and effort expended in assisting the prosecution of the litigation, the risks incurred by becoming and continuing as a litigant, and any other burdens sustained by the plaintiff[s]." *Reyes*, 2011 WL 4599822, at *9. Incentive awards fulfill the important purpose of compensating plaintiffs for the time they spend and the risks they take. *Massiah*, 2012 WL 5874655, at *8.

Here, the participation of Mr. Ruppel was critical to the ultimate success of the case. *See* Marchese Decl. ¶¶ 77-79. Mr. Ruppel spent approximately 60 hours protecting the interests of the class through his involvement in this case. *See* Declaration of Don Ruppel ("Ruppel Decl.") ¶ 11. Mr. Ruppel assisted Class Counsel in investigating his claims, by detailing his magazine subscription histories and aiding in drafting the Complaint. *Id.* ¶¶ 3-4. During the course of this litigation, Mr. Ruppel kept in regular contact with his lawyers to receive updates on the progress of the case and to discuss strategy. *Id.* ¶ 5. Further, Mr. Ruppel preserved and produced documents in discovery. *Id.* ¶ 6. And Mr. Ruppel prepared for and sat for his deposition in New York City. *Id.* ¶ 7. Finally, Mr. Ruppel was actively consulted during the settlement process. *Id.* ¶ 8.

On these facts, the $7,500 incentive payment is fair and reasonable. Indeed, this Court approved an incentive award of $5,000 for the Class Representative in *Trusted Media Brands*, but she did not sit for a deposition, and she had spent approximately 30 hours protecting the interests of the class through her involvement in the case. *TMBI* Hearing Tr. at 15:10-19. Here,

by contrast, Mr. Ruppel sat for a deposition in New York City and spent approximately 60 hours protecting the interests of the class through his involvement in the case.  Ruppel Decl. ¶¶ 7, 11. Thus, a higher incentive award is warranted.

Moreover, the requested $7,500 is well within the range of incentive awards approved by other courts in this Circuit.  *See, e.g.*, *Raniere v. Citigroup Inc.*, 310 F.R.D. 211, 220 (S.D.N.Y. 2015) (approving incentive awards ranging from $7,500 to $20,000); *Dornberger v. Metro. Life Ins. Co.*, 203 F.R.D. 118, 125 (S.D.N.Y. 2001) (noting case law supports payments of between $2,500 and $85,000.  Finally, the requested incentive award is approximately 0.04% of the Settlement Fund, which is similar to other cases.  *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 131 (S.D.N.Y. Oct. 22, 2009) (approving incentive award of approximately 0.1% of the settlement fund).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court (1) approve attorneys' fees, costs, and expenses in the amount of one-third of the settlement fund, or $5,458,333.33, (2) grant Mr. Ruppel an incentive award of $7,500 in recognition of his efforts on behalf of the class, and (3) award such other and further relief as the Court deems reasonable and just.

Dated:  September 18, 2018

                                      Respectfully submitted,

                                        By:    */s/ Joseph I. Marchese*
                                              Joseph I. Marchese

                                       **BURSOR & FISHER, P.A.**
                                       Scott A. Bursor
                                       Joseph I. Marchese
                                       Philip L. Fraietta
                                       888 Seventh Avenue
                                       New York, NY 10019
                                       Telephone:  (646) 837-7150
                                       Facsimile:  (212) 989-9163
                                       Email:  scott@bursor.com
                                                 jmarchese@bursor.com
                                                 pfraietta@bursor.com

                                       Frederick J. Klorczyk III
                                       1990 North California Blvd., Suite 940
                                       Walnut Creek, CA 94596
                                       Telephone:  (925) 300-4455
                                       Facsimile:  (925) 407-2700
                                       Email:  fklorczyk@bursor.com

                                       *Class Counsel*